J. J. FUNSTEN ET AL., Respondents, *v.* N. C. SNYDER, INTERPLEADER, Appellant.

### December 4, 1883.

EVIDENCE — RES GESTÆ. — The question being as to whether there was a sale and purchase of a draft, statements of the indorser as to his intention in making the transfer, made without the indorsee's knowledge, are inadmissible.

APPEAL from the St. Louis Circuit Court, ADAMS, J. *Reversed and remanded.*

McKEIGHAN & JONES, for the appellant.

M. N. SALE, for the respondent.

LEWIS, P. J., delivered the opinion of the court.

The controversy in this cause turns upon the ownership of a draft drawn by M. L. Cohn on Adler, Goldman & Co. for $965.30, in favor of A. S. Johnson, dated March 6, 1882, and made payable at sight. The draft was indorsed by the payee to the order of J. B. Snyder, cashier, and mailed on March 7th at Newport, Arkansas, to the banking house of N. C. Snyder, the present interpleader, at Grenada, Mississippi. If, in this transaction, the banker became a mere collecting agent for Johnson, and was to hold the proceeds of the draft when collected for Johnson's credit, the judgment rendered by the court below in favor of the plaintiffs was proper, and should not be disturbed. But if the transaction involved a sale of the draft by Johnson and a purchase thereof by Snyder, then the judgment should be against the plaintiffs and in favor of the interpleader. The issue arises upon certain attachment and garnishment proceedings, which need not be described in detail.

The testimony tended to show that there had been a long course of previous dealings between Johnson and Snyder in banking matters. Johnson had, on many occasions, sent

drafts to the banker, who, immediately on their receipt, entered their amounts to Johnson's credit on current account. Until the present instance every such draft was collected in due course. Johnson's letter enclosing the draft in controversy contained also two smaller drafts, or checks, with the advice that the writer had, on the same day, drawn on the banker, in favor of W. F. Johnson, for $2,499.70, and a request that this last be paid. A letter was received by Snyder, on the same day with the other, purporting to be from W. F. Johnson, and containing the last mentioned draft, with a request that it be passed to the writer's credit, subject to his draft. Entries were made on the banker's books in accordance with this correspondence. The account of A. S. Johnson was debited by the amount of the large draft, and an account was opened for the like amount in favor of W. F. Johnson, whose checks against the same in various sums were afterwards paid; but not to an extent sufficient to cover the amount of the draft in controversy, whose payment was refused by the drawer (failing acceptance and payment by the drawees) because of the garnishment. Both Snyder and his cashier testified, in effect, that they treated as a purchase the acquisition of the draft in controversy, and that they did not consider it as received for collection only.

There was testimony tending to show that when A. S. Johnson mailed the draft in controversy he was in failing circumstances, and that all the writings and signatures which purported to be those of W. F. Johnson were in fact written by A. S. Johnson; that W. F. Johnson was a younger brother, of irregular habits, and without means. Notwithstanding this testimony, it was conceded in the trial — and the court so told the jury — that no issue was to be considered as to whether the interpleader was assisting A. S. Johnson to defraud his creditors, and that the interpleader's alleged title to the draft was not attacked on

the ground of any fraud practiced or attempted upon creditors by either Johnson or the interpleader.

The court permitted the plaintiffs to introduce, against the interpleader's objections, the following testimony of William W. Smith. (The conversation referred to occurred in Newport Arkansas) : "I saw A. S. Johnson with this draft the night he left here, and I think he left here on the night of the 7th of March. It was the night after he sold out here. I was down in his room talking to him, and he took the draft out. This was done just a little while before or after seven o'clock p. m., and just before the train was due on which he went off. He indorsed the draft, or wrote across the back of it, that evening at his room at White Hotel.   *   *   *   He told me he had wrote to Jake Snyder, whose father had a bank in which Jake was, at Grenada, Miss., and told Jake to take his (Johnson's) money out of the bank and balance his account, and to keep what balance was due him, so that his creditors could not attach or garnishee the bank for what he owed, or for his debts. He said that his cousin got married one week, and broke the next, and that Jake Snyder had done this for him. He said that he now had that fixed, but must go home and fix what real estate he had, so his creditors could not get hold of it."

It seems that this testimony was admitted — although the conversation detailed was not in the presence of the interpleader, nor communicated to him — on the ground that it had a bearing to show what Johnson intended in his transmission of the draft to Snyder, and hence his declarations were admissible, as being part of the *res gestæ*. We think that such an application of the rules relating to *res gestæ* is not sanctioned by either principle or authority. If the matter in issue were solely the intentions of Johnson, or the character of the act done by him, as it might operate to affect his interest, and not that of another, his declara-

tions at the time of the act might very clearly belong to the *res gestœ*. But when we come to inquire what was the agreed intention of both the parties to a contract — in other words, what was their contract — the secret intentions of one of them, about which the other neither knows, nor can know anything, are as absolutely foreign to the point sought, as would be the intentions of an entire stranger. It is the mutually communicated, understood, and agreed intentions of the two parties, that constitute their contract. True, the contract is compounded of two distinct and primary elements, to wit, the separate consent or intention of each contractor; and, as a general rule, a title, or obligation, similarly divisible, may be proved by a separate showing of each of its constituents. But where the proposed showing of one such element does, in its very nature, and in all its surroundings, exclude the existence of its essential counterpart, nothing but mischief or injustice can possibly result from its introduction. The case before us furnishes a sufficient illustration of the general truth. If the real facts were, that the interpleader made an absolute purchase of the draft in controversy, and that Johnson sold it to him, as was well understood between them, the testimony under consideration might go far to convince a jury of the contrary, while it would be powerless to throw any true light upon the form of the mutual understanding. An expression of one party's intention has not even a bearing to show the intention of the other, when that other knows nothing about it, and has no opportunity to express either his assent or dissent. Johnson's statements to Smith were made when the interpleader was more than a hundred miles away, in another State. If it be true in law that the interpleader's contract rights may be affected by them, then, in any case where a man proposes to enter into a fair contract with another, and yet to keep open a door whereby he may himself escape its obligations, he has only to tell a third person privately that he

intends to make a different contract, or none at all. Even in a case of alleged fraudulent conveyance, it is never admissible to prove against the grantee the fraudulent purpose of the grantor, without a showing that the grantee shared in, or at least knew of, the fraudulent purpose. A participation by both parties is quite as essential to prove an honest agreement, as it is to establish a fraudulent one, to dissimilar ends. The authorities cited by counsel for the plaintiffs have no relevancy to this question. They are cases of declarations made by persons holding a certain possession, and admitted to show the character of that possession — by persons charged with crime, and admitted to show the criminal intent — and cases which serve generally to show how a person's declarations may affect his own rights, liabilities, or *status*, and those of parties claiming in privity with him. They have no application in a case like the present, where the declarations are employed to defeat the contract right of another party, standing in antagonism with that which the declarations are supposed to sustain. We think it quite clear that the testimony referred to was erroneously admitted, and that its character was such as might seriously prejudice the rights of the interpleader. The judgment is therefore reversed, and the cause remanded. All the judges concur.